NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0037n.06

No. 18-5674

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| In re: HNRC DISSOLUTION COMPANY, | ) | |
| Debtor. | ) | |
| | ) | |
| ———————————————————— | ) | On Appeal from the Bankruptcy |
| | ) | Appellate Panel of the Sixth Circuit |
| TERRY GIESE, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEXINGTON COAL COMPANY, | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| COMMUNITY TRUST BANK; | ) | |
| INTERNATIONAL COAL GROUP, INC., | ) | |
| Defendants. | ) | |
| ———————————————————/ | | |

**FILED**
Jan 24, 2019
DEBORAH S. HUNT, Clerk

**Before: MERRITT, GUY, and MOORE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiff Terry Giese appeals the dismissal of his complaint, which asserted a right to and sought damages for the loss of funds from an account that was the subject of prior bankruptcy court orders entered in the above-captioned Chapter 11 case and a follow-on adversary interpleader action. The funds had been held in an account named "Leslie Resources – E. Begley Escrow" maintained by Community Trust Bank (Account). The Account was scheduled as an asset of the debtor Leslie Resources, Inc. (Leslie) and the bulk of

Leslie's assets were sold at auction to two purchasers:  International Coal Group, Inc. (ICG) and Lexington Coal Company (LCC).  After confirmation of the Chapter 11 plans, Community Trust Bank (Bank) brought an adversary interpleader action that resulted in the entry of an order distributing the funds between ICG and LCC.  Seven years later, standing in the shoes of some of E. Begley's heirs, Giese filed this action in state court against the non-diverse defendants ICG, LCC, and the Bank asserting claims for collection of royalties, conversion, breach of fiduciary duty, negligence, misrepresentation, breach of contract, and unjust enrichment.

After removal, the district court denied Giese's motion to remand because the proceeding was "at least 'related to' the bankruptcy" for purposes of 28 U.S.C. § 1334(b) and then referred the matter to the bankruptcy court.  *Giese v. Cmty. Trust Bank, Inc.*, No. 14-126-GFVT, 2015 WL 1481618, at *4 (E.D. Ky. March 31, 2015) (*Giese I*).  The bankruptcy court denied Giese's demand for mandatory abstention under 28 U.S.C. § 1334(c)(2) and granted the defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  *Giese v. Cmty. Trust Bank, Inc. (In re HNRC Dissolution Co.)*, Adv. No. 15-1005, 2015 WL 5299468 (Bankr. E.D. Ky. Sept. 9, 2015) (*Giese II*); *Giese v. Cmty. Trust Bank, Inc. (In re HNRC Dissolution Co.)*, 549 B.R. 469 (Bankr. E.D. Ky. 2016) (*Giese III*).  The judgment was affirmed by the Bankruptcy Appellate Panel (BAP). *Giese v. Cmty. Trust Bank, Inc. (In re HNRC Dissolution Co.)*, 585 B.R. 837 (B.A.P. 6th Cir. 2018) (*Giese IV*).  In this appeal, Giese challenges the jurisdictional basis for removal, the denial of his motion for mandatory abstention, and the dismissal of his claims on the merits.  For the reasons that follow, we affirm.[1]

---

[1]The record reflects that the parties expressly consented to final adjudication by the bankruptcy court of all core and non-core claims. *See Exec. Ben. Ins. Agency v. Arkison*, 573 U.S. 25, 34-35 (2014).

**I.**

To avoid belaboring the record with another recitation of the largely undisputed facts, we assume familiarity with the opinions of the district court, the bankruptcy court, and the BAP. Because resolution of the issues on appeal requires an understanding of the Chapter 11 case and adversary interpleader action, we begin there.

**A.        Bankruptcy Case**

In 2002, Leslie Resources, Inc., and 160 affiliates filed voluntary Chapter 11 bankruptcy petitions that were consolidated and jointly administered in the lead case (*In re HNRC Dissolution Co.*, No. 02-14261).  One asset on Leslie's personal property schedules was "1870-001 restricted cash" in the amount of $316,358.  Leslie's schedules did not otherwise identify the account or the nature of the restriction.  But an attachment to the debtors' joint cash management motion listed one of Leslie's two miscellaneous accounts as "E Begley Escrow (1870-001)" at "Community Trust."  In fact, there seems to be no real dispute that the asset listed in Leslie's schedules referred to the funds in the Account at the heart of Giese's claims, which was apparently used to hold royalty payments for mineral leases between Leslie and some (but not all) of the owners of the property who were heirs of Emmit Begley.  Giese alleges that the funds should not have been included in the bankruptcy estate, but no proof of claim was filed and no objection was made to its treatment as estate property in the bankruptcy case or confirmation process.  *Giese IV*, 585 B.R. at 841.

The debtors filed their initial and amended joint plans of reorganization and liquidation in 2004, which contemplated the sale of substantially all of the debtors' assets (including Leslie's) to a proposed purchaser subject to overbids.  *Giese III*, 549 B.R. at 473.  As Giese emphasizes, the debtors' final disclosures included a consolidated balance sheet showing an entry under Leslie's

"Other Assets" for "1870-002 Royalty Escrow" in the amount of $325,819. The bankruptcy court approved the proposed auction procedures, a breakup fee, the form and manner of the notice of sale, and a deadline for objections to the proposed sale. *Giese III*, 549 B.R. at 473-74.

The auction held on August 17, 2004, resulted in the purchase of substantially all of the debtors' assets by the two entities that would become ICG and LCC. *Id*. at 474. As is pertinent here, ICG agreed to purchase the bulk of Leslie's assets—including a leasehold interest in Leslie, Kentucky, and rights in a lease agreement identified as "Emmit Begley Heirs Escrow" (Lease). *Id*. at 474-75. LCC agreed to purchase the remainder of the assets, but the purchase agreements of ICG and LCC both purported to include "all cash and cash equivalents" without further specification. *Id*. On September 16, 2004, the bankruptcy court approved the Asset Purchase Agreements (Sale Order) and confirmed the Debtors' Joint Third Amended Plans for Reorganization and Liquidation (Confirmation Orders). *Id*. at 475.

Without restating all of the potentially relevant provisions of the Sale and Confirmation Orders, it is worth noting that the bankruptcy court's orders included findings: (1) that proper and adequate notice had been given in connection with the sale and confirmation; (2) that the purchasers were entitled to the protections of good faith purchasers under 11 U.S.C. § 363(m); (3) that all right, title, and interest vested in the purchasers "free and clear of any encumbrances"; and (4) that no liability was assumed for obligations of the debtor or claims against the debtor related to the purchased assets except as expressly provided. *Id*. at 475-76. The Sale Order also stated that it was binding on "the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor (whether known or unknown)" and enjoined actions against the purchasers with respect to any encumbrance or successor liability. *Id*. at 475. The Confirmation Orders similarly declared that they were binding on the debtors, liquidating trustee, entities issuing

securities or acquiring property under the plans, holders of claims and equity interests, non-debtor parties to executory contracts and unexpired leases, "and the heirs, executors, administrators, successors or assigns, if any, of any of the foregoing." *Id*. at 476. Also, all entities were enjoined from taking any action on "Claims, debts or Causes of Action against, interests in or Liens on, property of any and all Debtors," and the bankruptcy court expressly retained jurisdiction to the extent permitted by law. *Id*. The effective date of the confirmed plans was September 30, 2004.[2]

### B.        Adversary Interpleader Action

In 2006, after receiving demands from LCC and ICG, Community Bank filed its adversary interpleader action in bankruptcy court against the debtor, the liquidating trustee, LCC, ICG, and "Mr. Begley—an unknown claimant referred to on the Business Account Agreements." The Bank alleged that Leslie opened the Account in 1997 as "Leslie Resources E. Begley Escrow," and later changed the account owner to an address in Ashland, Kentucky, and the account name to "Leslie Resources – E. Begley Escrow." The Bank represented that despite a "diligent search and inquiry, it was unable to determine E. Begley's whereabouts or full name and sought leave to serve E. Begley by publication." *Giese III*, 549 B.R. at 477. The Bank's motion was granted and service was made in the manner and mode authorized. *Id*. After default judgments were entered as to all parties except ICG and LCC, the funds were deposited with the bankruptcy court and the Bank

---

[2]Giese emphasizes that some of the debtors' causes of action were transferred to a liquidating trust, which made its final distributions and terminated as of December 31, 2009. There is no suggestion, however, that the funds at issue were transferred to the liquidating trust. Rather, this seems to be an acknowledgement that the bankruptcy case continued for the benefit of unsecured creditors until then.

was dismissed as a party. In December 2006, an agreed order was entered dismissing the adversary proceeding and dividing the funds between ICG (67%) and LCC (33%). *Id.*[3]

### C.     Giese's State-Court Complaint

Giese's May 2014 complaint alleged that, sometime in the 1990s, Leslie Resources executed mineral leases for a coal-rich tract of property that was owned at the time by the heirs of Emmit Begley (who had died in 1936). Although the Lease between Leslie and six leasing heirs stated that they were the sole owners of the property, Giese alleges that there were two other owners and heirs. The non-leasing heirs—Bertha and Arnold Begley—were not included in the Lease for reasons that are not explained by anyone. Coal was mined during 1997, 1998, and 1999, and disbursements were made to the leasing heirs in September 2000. It is alleged that the remaining funds in the Account must be mineral royalties belonging to Bertha and Arnold Begley and, in turn, their heirs and/or assigns. Giese contends that the non-leasing heirs (or their heirs) had no actual notice of the Lease, Leslie's bankruptcy, or the Bank's interpleader action. Giese brings this action as a successor in interest based on his purchases in 2009 and 2013 of the non-leasing heirs' right, title, claim, interest, and rights to past royalties and causes of action.

Giese's seven-count complaint alleged state-law claims against ICG, LCC, and/or the Bank. *Giese II*, 2015 WL 5299468, at *3. Several claims directly asserted a superior right to the funds over ICG and LCC: "Collection of Royalties" claimed title to the Account (Count 1); "Conversion" alleged wrongful taking of the funds from the Account (Count 2); and "Unjust

---

[3]The notice to "E. Begley," published in two Kentucky papers for two weeks, read: "E. Begley, unknown first name and unknown address, has been named as a Defendant in the case styled Community Trust Bank, Inc., successor in interest to Citizens Bank and Trust v. LRI Dissolution Co. f/k/a Leslie Resources, Inc., et al., United States Bankruptcy Court, Eastern District of Kentucky, Adversary No. 06-01022. The issues in the case concern potential competing claims and ultimate disposition of a commercial deposit bank account wherein the account owner is listed as "Leslie Resources – E. Begley Escrow." This public notice completes personal service on E. Begley and E. Begley shall have to and including _____ (30 days from date of first publication) to appear and file a motion or answer to the complaint."

Enrichment" sought to recover for the inequitable retention of the funds from the Account at plaintiff's expense (Count 7). Asserting "Breach of Fiduciary Duty," the complaint alleged breach of duties owed to owners of the property by failing to diligently search for and notify the non-leasing heirs of their interest in the Account, the interpleader action involving the Account, or the agreement to divide (and convert) the funds in the Account (Count 3). In the only counts that named all three defendants, the complaint alleged: "Negligence" during the interpleader action by failing to diligently search for the non-leasing owners or their heirs and ensure that the royalties were paid to the rightful owners (Count 4); and "Misrepresentation" during the interpleader action by failing to provide notice to the non-leasing heirs and making false statements about the diligence of the search for E. Begley and the need for service by publication. (Count 5). Finally, the "Breach of Contract" claim alleged that ICG and/or LCC had assumed Leslie's pre-petition obligations to pay mineral lease royalties to the non-leasing heirs either as owners of the property or as third-party beneficiaries of the Lease (Count 6).

Notably, LCC is the only appellee before us. When ICG filed its own bankruptcy petition, Giese filed a proof of claim, settled with ICG, and dismissed this case against ICG with prejudice. Giese also voluntarily dismissed the Bank as a party during the appeal before the BAP. Setting aside for now the merits of these claims, we turn first to the questions of subject matter jurisdiction and mandatory abstention.

## II.

In an appeal from the BAP, this court reviews the bankruptcy or district court's decisions directly. *In re Schaefer*, 689 F.3d 601, 605 (6th Cir. 2012). In doing so, we review the court's legal conclusions *de novo* and any factual findings for clear error. *Id.*; *see also U.S. Bank Nat'l*

*Ass'n. v. Vill. at Lakeridge*, 138 S. Ct. 960, 967 (2018) (holding that the review of mixed questions depends "on whether answering it entails primarily legal or factual work").

## A.      Jurisdiction

Removal of "any claim or cause of action in a civil action" is authorized under 28 U.S.C. § 1452 (with some exceptions not applicable here) if the district court has jurisdiction under 28 U.S.C. § 1334.  District courts have original and exclusive jurisdiction "of all cases under title 11," but that refers to the bankruptcy petition itself and does not apply here.  28 U.S.C. § 1334(a); *see Robinson v. Mich. Consol. Gas Co.*, 918 F.2d 579, 583 (6th Cir. 1990).  District courts also have original but non-exclusive jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  That non-exclusive jurisdiction includes three categories:  (1) proceedings "arising under title 11"; (2) proceedings "arising in" a case under title 11; and (3) proceedings "related to" a case under title 11.  *Mich. Emp't. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1140-41 (6th Cir. 1991).  Because these three categories "operate conjunctively to define the scope of jurisdiction" under § 1334(b), it is not necessary to distinguish between them for purposes of determining jurisdiction and the court need only "determine whether a matter is at least 'related to' the bankruptcy."  *Id*. at 1141 (citing *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987)).

An expansive definition of "related to" jurisdiction governs § 1334(b).  *Wolverine Radio*, 930 F.2d at 1141 (citing *Robinson*, 918 F.2d at 583); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995) ("related to" jurisdiction is intended to be broad but not limitless).  The "usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care*

*Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 489 (6th Cir. 1996) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  In other words, there is "related to" jurisdiction if the *outcome* of the proceeding could *conceivably* "alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" or otherwise impact "the handling and administration of the bankrupt estate."  *Id*. (quoting *Pacor*, 743 F.2d at 994).  A proceeding need not be against the debtor or the debtor's property to be within the "related to" jurisdiction, but "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of [§ 1334(b)]."  *Id*. (quoting *Pacor*, 743 F.2d at 994).  Rather, "there must be some nexus between the 'related' civil proceeding and the title 11 case."  *Id*. (quoting *Pacor*, 743 F.2d at 994).  The district court recognized and applied these principles in denying Giese's motion to remand for lack of jurisdiction under § 1334(b), concluding that the state-court action was at least "related to" the bankruptcy proceeding.  *See Giese I*, 2015 WL 1481618, at *3-6.

Giese contends that the district court (and the bankruptcy court by extension) lacked "related to" jurisdiction because when he finally brought this action there was no longer a bankruptcy estate that could be affected by its outcome.  It is true that, "[a]t the most literal level, it is impossible for a bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred."  *In re Greektown Holdings, LLC*, 728 F.3d 567, 577 (6th Cir. 2013) (quoting *Resorts Int'l Fin., Inc. v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004)).  But this court has not read the test so literally, noting instead only that "[i]t is possible that a bankruptcy court's 'related to' jurisdiction diminishes somewhat post-confirmation."  *Id*.  In fact, § 1334(b) does not distinguish between pre- and post-confirmation jurisdiction.  Also, the bankruptcy statute and rules provide

for post-confirmation actions that imply some jurisdiction to do so. *Resorts Int'l*, 372 F.3d at 165.

The "related to" inquiry asks "whether there is a nexus between the other proceeding and the

*bankruptcy case*." *Greektown Holdings*, 726 F.3d at 578 (citing *Lindsey*, 86 F.3d at 489).

The district court reasoned that, among other things, Giese's claims would involve legal

issues concerning the interpretation, validity, and enforcement of the bankruptcy court's orders.

That is certainly true and is evident from the complaint's assertions of a superior right to the funds

because the Account was not properly listed as property of the debtor and was not validly

transferred to the purchasers free of prior liens or without the assumption of successor liability.

Similarly, Giese's claims for negligence, misrepresentation, and breach of fiduciary duty alleged

misconduct in the course of the adversary interpleader action that resulted in the allegedly wrongful

distribution of the funds to ICG and LCC. If Giese were to prevail, it could conceivably affect the

debtor's rights and liabilities because the purchasers would have a claim against the estate for

breach of the purchase agreements (which provided as a material term that the purchase was "free

and clear"). Also, if Giese were to succeed in undoing the confirmed sale, it could conceivably

require re-administration of the Account in bankruptcy. We agree that this action was "at least

'related to' the bankruptcy" for purpose of determining jurisdiction under § 1334(b). In short, the

district court did not err in denying Giese's motion to remand for lack of subject matter

jurisdiction.[4]

---

[4]Some courts have held that post-confirmation "related to" jurisdiction exists only if the claim "affect[s] an integral aspect of the bankruptcy process—there must be a close nexus to the bankruptcy plan or proceeding." *Resorts Int'l*, 372 F.3d at 167; *see also In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005). Such matters would typically include those "that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Resorts Int'l*, 372 F.3d at 167; *see also McKinstry v. Sergent*, 442 B.R. 567, 574-76 (E.D. Ky. 2011). This court has not yet endorsed this "close nexus" test for narrowed post-confirmation jurisdiction, but it would easily be met here.

## B.      Mandatory Abstention

Even when there is subject matter jurisdiction under § 1334(b), the court may nonetheless be required to abstain from hearing certain "non-core" proceedings under § 1334(c)(2) (with some exceptions not relevant here).  *Lindsey*, 86 F.3d at 497; *Robinson*, 918 F.2d at 584 ("Mandatory abstention under § 1334(b) is not jurisdictional[.]").  Specifically, the court must abstain on a timely motion of a party when the proceeding:  (1) is based on a state law claim or cause of action; (2) lacks a federal jurisdictional basis absent the bankruptcy; (3) is commenced in a state forum of appropriate jurisdiction; (4) is capable of timely adjudication; and (5) is a "non-core" proceeding. *See Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 320 (6th Cir. 2006) (quoting *Lindsey*, 86 F.3d at 497).  The only one of these conditions in dispute is whether this action is a "core" or "non-core" proceeding.

The distinction between core and non-core proceedings is found in 28 U.S.C. § 157, which allocates statutory authority to enter final judgment between district courts and bankruptcy courts. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34-36 (2014); *see also Stern v. Marshall*, 564 U.S. 462, 480 (2011) ("That allocation does not implicate questions of subject matter jurisdiction.").  A *non*-core proceeding is one that is *not* core but is "otherwise related to a case under title 11." *Arkison*, 573 U.S. at 34 (quoting 28 U.S.C. § 157(c)(1)).  "[C]ore proceedings are those that arise in a bankruptcy case or under Title 11." *Stern*, 564 U.S. at 476; *see also* 28 U.S.C. § 157(b)(2) (non-exclusive list of core proceedings).  This court has consistently described a core proceeding as one that "either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Lowenbraun*, 453 F.3d at 320 (quoting *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 482 (6th Cir. 1992)).  We look at

both the form and the substance in making that determination. *Sanders*, 973 F.2d at 483; *see also*

*Wolverine Radio*, 930 F.3d at 1144.

In denying Giese's motion for mandatory abstention, the bankruptcy court concluded:

(1) that Counts 2-5 and 7 (and probably Counts 1 and 6) were core proceedings; and (2) that

abstention was not required as long as *some* of the claims were core proceedings. *Giese II*, 2015

WL 5299468, at *5-8. The BAP affirmed. *Giese IV*, 585 B.R. at 844-47. Giese challenges both

determinations in this appeal.[5]

### 1.      Counts 2-5 and 7

To start, Giese concedes that the bankruptcy court correctly applied this court's decision

in *Lowenbraun* in concluding that Counts 2-5 and 7 were core claims. We would say no more

with respect to these claims, except that Giese argues that *Lowenbraun* was wrongly decided and

its interpretation of "arising in" is so broad as to threaten to run afoul of *Stern*. This argument

misses the mark for several reasons.

First and foremost, *Lowenbraun* remains controlling because it has not been overruled by

an en banc decision of this court and *Stern* is not an inconsistent decision of the United States

Supreme Court that would require modification of *Lowenbraun*. *See Salmi v. Sec'y. of Health and*

*Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). In addition, Giese reads *Lowenbraun* more

broadly than is warranted to require nothing more than a "but for" relationship to the bankruptcy

proceeding. *See Lowenbraun*, 453 F.3d at 321 (stating "claims would not exist but for the

bankruptcy proceeding"). In fact, as the bankruptcy court summarized, *Lowenbraun* held "that a

debtor's ex-wife's defamation action against counsel for her husband's bankruptcy trustee, for

---

[5]The permissive abstention provisions apply to a "proceeding arising under title 11 or arising in or related to a case under title 11," § 1334(c)(1), while mandatory abstention applies "in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11," § 1334(c)(2).

remarks counsel made in prosecuting the trustee's contempt motion against the ex-wife, arose in the debtor's bankruptcy case." *Giese II*, 2015 WL 5299468, at \*5 (citing *Lowenbraun*, 453 F.3d at 320-21). In other words, not only could the claim not have existed "but for" the bankruptcy, but the factual underpinnings of the claim actually arose in the bankruptcy case.

Moreover, we conclude that the substance of Giese's state law tort claims could not exist outside the bankruptcy. These claims could not have been brought prior to the bankruptcy as they were based on conduct during the adversary interpleader action in bankruptcy. As the bankruptcy court explained: "All of Plaintiff's tort and quasi-contract theories fault Defendants for bad acts in the CTB adversary proceeding, which resulted in the entry of a judgment that deprived Plaintiff's predecessors-in-interest of title to the funds in the CTB account and caused Plaintiff to suffer damages in the amount of those funds." *Id*. at \*6. Further, this dispute centers on an asset administered in bankruptcy and Giese's claims that he (or his predecessors) have an ownership interest in that asset—an issue that was determined during the bankruptcy and interpleader proceedings. However broadly Giese wants to read *Lowenbraun*, the case at hand is unlike *Stern*, which involved a state-law counterclaim, the factual underpinnings of which were entirely separate from the bankruptcy proceeding. *See Stern*, 564 U.S. at 470. The bankruptcy court did not err in finding these claims would not be subject to mandatory abstention.

### 2.      Counts 1 & 6

The bankruptcy court declared that it was not necessary to determine whether the remaining claims were core for purposes of mandatory abstention because they were "inextricably intertwined with and seek the same relief as the other five [claims]." *Giese II*, 2015 WL 5299468, at \*7 (citing *Milford Grp., Inc. v. Ne. Bank of Pa. (In re Milford Grp., Inc.)*, 164 B.R. 892, 897 (Bankr. M.D. Pa. 1993)). The BAP agreed that "proceeding" in this context should mean "the

whole adversary proceeding and not the individual, discrete claims raised therein." *Giese IV*, 585 B.R. at 845; *see also Milford*, 164 B.R. 897 ("This Court has determined that *some* of the claims [but not all] within the proceeding do arise under Title 11 and are therefore core matters. Consequently, the Court finds that the request for mandatory abstention must be denied." (emphasis added.)). The BAP found support in the fact that *Lowenbraun* did not analyze the claims at issue separately when determining whether a proceeding was "core." Further, the BAP distinguished our prior holding in *Waldman v. Stone* that whether a proceeding is "core" is determined on a claim-by-claim basis, 698 F.3d 910, 921 (6th Cir. 2012), because *Waldman* involved § 157 (not § 1344(c)). Neither case addressed this issue directly or in the context presented by this case, and there is little authority on point.

In determining whether a bankruptcy court order was final and appealable, this court recently emphasized that a "proceeding" is generally defined as "any subaction raised or commenced within the case, including motions or adversary proceedings, which may raise a disputed or litigated matter." *Ritzen Grp., Inc. v. Jackson Masonry, LLC (In re Jackson Masonry, LLC)*, 906 F.3d 494, 500 (6th Cir. 2018) (quoting Collier on Bankruptcy ¶ 301.03 (15th ed. 1996)). It may be that for purposes of mandatory abstention under § 1334(c)(2), a "proceeding" is meant to refer to the whole adversary proceeding. However, in *Waldman*, we specifically held that: "Whether a proceeding is core is determined on a claim-by-claim basis." *Waldman*, 698 F.3d at 921 (citing *In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008)). It is true that *Waldman* did not involve a question of abstention, but *Waldman* relied on *Exide* which applied the claim-by-claim approach under both § 157 *and* § 1334(c)(2). *See Exide*, 544 F.3d at 218 n.14 (instructing the court on remand to abstain as to any non-core claims). If nothing else, the Third Circuit's instructions in *Exide* undermines the earlier unexplained conclusion of the bankruptcy court in

*Milford*. The parties offer little more than this by way of analysis. Even if Giese is correct in his interpretation of § 1334(c)(2), however, the only question would be whether the bankruptcy court should have abstained as to Counts 1 and 6. As will be explained, Count 1 is "core" because it implicates the bankruptcy code and whether Count 6 is "core" is moot because Giese settled with ICG, which is the only party that matters as to the breach-of-contract claim. Therefore, any error in the reliance on *Milford* would be inconsequential.

Giese argues that these claims were not core proceedings because they were state law claims seeking to quiet title in the Account funds (Count 1) and for Leslie's breach of the Lease by failing to pay the Account funds to the non-leasing heirs (Count 6). Although the form of these state-law claims can exist outside bankruptcy, we also look to their substance. First, the quiet-title claim alleged that as purchasers of Leslie's assets, ICG and LCC "became legally obligated to pay the proceeds of the Escrow Account to the rightful owners" and "[i]f they purchased any right to the Escrow Account, such rights were subject to the superior rights (by lien or ownership) of Bertha Begley and the heirs of Arnold Begley." This would involve a determination whether the Account was property of the estate under 11 U.S.C. § 541 and whether the purchasers of assets under 11 U.S.C. § 363 were obligated to pay the proceeds of the Account to the non-leasing heirs. This claim to a superior right to the funds would not exist outside the bankruptcy and, therefore, was not subject to mandatory abstention.

The breach-of-contract claim is a little different because it seeks to hold ICG and LCC liable for Leslie's pre-petition failures to pay mineral royalties to the non-leasing heirs either as part owners of the property or as third-party beneficiaries of the contract. The debtor's breach will be determined by state law, although the ability to hold ICG or LCC liable as successors or assigns will depend on the terms of the purchase agreements and what, if any, obligations were assumed.

Whether this claim is a core proceeding is not so obvious.  But even if it is *not* a core proceeding, any error in the failure to abstain from hearing Count 6 is moot because Giese settled his claim against ICG (the undisputed purchaser of the leasehold and rights under the Lease).  *See* Appt's Bf., at 10 ("ICG won Leslie's rights in the Begley lease.").  Because the other claims were all core, the bankruptcy court did not err in refusing to abstain from hearing them under § 1334(c)(2).

## C.        Dismissal for Failure to State a Claim

Finally, in April 2016, the bankruptcy court reached the merits of these claims on the motion of LCC and the Bank to dismiss the complaint for failure to state a claim (an automatic stay was in place as to ICG because of its own bankruptcy filing).  *See* Fed. Bankr. R. P. 7012(b) (incorporating Fed. R. Civ. P. 12(b)).  The bankruptcy court outlined the facts and relevant orders in detail, analyzed whether Giese's claims were precluded by the prior orders, and concluded that "[Giese's] claims that his predecessors-in-interest have, or had, an interest in the [Bank's] Account" and the additional "claims predicated on that alleged entitlement to those funds, are barred as a matter of law."  *Giese III*, 549 B.R. at 473-84.  The BAP affirmed.  *Giese IV*, 585 B.R. at 847-49.

*Res judicata*, also known as claim preclusion, has four elements:  "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action."  *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577-78 (6th Cir. 2008) (quoting *Browning v. Levy*, 283 F.3d 761, 771-72 (6th Cir. 2002)).  Giese does not dispute that a confirmation order is a final judgment in a bankruptcy case that bars re-litigation of any issues that could have been raised during the confirmation proceeding.  *Still v. Rossville Bank (In re Chattanooga Wholesale Antiquities, Inc.)*,

930 F.2d 458, 463 (6th Cir. 1991). Likewise, an order approving the sale of assets in bankruptcy is also a final order, the execution of which precludes further litigation regarding those assets. *Winget*, 537 F.3d at 579.

Although Giese argues again that his predecessors in interest were not parties to the bankruptcy case, creditors and security holders are considered parties to the proceedings for *res judicata* purposes. *See Sanders*, 973 F.2d at 480-81. As the BAP explained, "Giese's claim to the Account could and should have been brought by his predecessor-in-interest, with whom he was in privity, during the bankruptcy case." *Giese IV*, 585 B.R. at 844. Giese argues that this was not true because the Account was not an asset of the debtor. But "[w]hether the account was an escrow account or a deposit account is of no import because there was adequate notice that all of the assets in which the [debtors] had an interest, including coal leases, cash and cash equivalents, were being sold." *Giese III*, 549 B.R. at 482. Further, because notice to the world was reasonably calculated to apprise interested parties of the sale and confirmation process, "[a]ny claim to the restricted cash should have been litigated in the bankruptcy sale/confirmation process." *Id.*

Finally, Giese argues that there was not an identity of the causes of action with respect to his tort claims because they arose post-confirmation and allege different facts. "Identity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *Sanders*, 973 F.2d at 484 (citation omitted). Although the claims for conversion and unjust enrichment seek to recover for the actual distribution of the funds at the conclusion of the interpleader action, those claims obviously rest on the same claim of a right to the funds. The other tort claims alleging misconduct during the interpleader action all asserted a duty to Giese's predecessors that likewise requires proof of a right to the funds. Addressing all of the claims, the BAP described the identity of facts and evidence as including, but not limited to:

facts and evidence regarding the true owner and purpose of the Account; facts and evidence regarding the nature of the notice provided for the sale; facts and evidence regarding the existence and nature of any duty owed by Lexington Coal to the non-leasing heirs; and facts and evidence otherwise related to the confirmation process and asset sale.

*Giese IV*, 585 B.R. at 848-49. We agree that the bankruptcy court correctly concluded that even Giese's tort claims "shared identity with the claims available to his predecessors during the bankruptcy case." *Id.* at 849. The bankruptcy court did not err in dismissing the claims against LCC as barred by the Sale and Confirmation Orders.

*    *    *

For the reasons discussed above, the judgment is **AFFIRMED**.